E-FILED; Baltimore City Circuit Court
Docket: 4/8/2026 3:12 PM; Submission: 4/8/2026 3:12 PM
Envelope: 25936351

# IN THE CIRCUIT COURT FOR
# BALTIMORE CITY

| | |
|---|---|
| CITY OF BALTIMORE, *ex rel.* Ebony Thompson, <br><br> *Plaintiff*, <br><br> v. <br><br> VGW MALTA LTD, VGW CANADA INC., VGW GP LTD, VGW GAMES LTD, VGW LUCKYLAND, INC., d/b/a CHUMBA CASINO and LUCKYLAND SLOTS, <br><br> B-TWO OPERATIONS LIMITED, MCLUCK INC., d/b/a MCLUCK CASINO, <br><br> YELLOW SOCIAL INTERACTIVE LIMITED, YSI US, INC., d/b/a PULSZ, <br><br> SWEEPSTEAKS LIMITED, EASYGO GROUP HOLDINGS PTY LTD., d/b/a STAKE.US, <br><br> PTT, LLC, HIGH 5 ENTERTAINMENT, LLC, d/b/a HIGH 5 Games, and, <br><br> BLAZESOFT LTD., SOCIAL GAMING LLC, d/b/a FORTUNE COINS, <br><br> *Defendants*. | Case No. C-24-CV-26-001646 <br><br><br> **JURY TRIAL DEMANDED** |

# FIRST AMENDED COMPLAINT

The Mayor and City Council of Baltimore ("Baltimore" or "the City"), by Ebony Thompson of the Baltimore City Law Department ("Plaintiff"), brings this action against VGW Malta Ltd., VGW Canada, Inc., VGW GP Ltd., VGW Games Ltd., and VGW Luckyland, Inc., d/b/a Chumba Casino and Luckyland Slots ("VGW"); B-Two Operations Limited and McLuck Inc., d/b/a McLuck Casino ("McLuck"); Yellow Social Interactive Limited and YSI US, Inc., d/b/a Pulsz ("Pulsz"); Sweepsteaks Limited and Easygo Group Holdings Pty Ltd., d/b/a Stake.us ("Stake.us"); PTT, LLC and High 5 Entertainment, LLC, d/b/a High 5 Games ("High 5"); and, Blazesoft Ltd. and Social Gaming, LLC, d/b/a Fortune Coins ("Fortune Coins") (collectively, "Defendants"), seeking civil penalties and injunctive relief to remedy Defendants' violations of the City of Baltimore's Consumer Protection Ordinance, Baltimore City Code Art. 2, § 4 ("CPO"). Baltimore alleges the following based on knowledge, the investigation of counsel, information, and belief.

## INTRODUCTION

1. Defendants operate illegal gambling enterprises in the City of Baltimore through online "social casinos." These platforms operate without any of the consumer protections that Maryland mandates for legal gambling within its borders.

2. Operating casino-style gambling—including slot machines, blackjack, poker, roulette, and similar games of chance—is illegal in Maryland except at six

1

specifically authorized brick-and-mortar casinos located in designated counties.[1] Online casino gambling has never been authorized in Maryland. The Maryland Lottery and Gaming Control Agency ("MLGCA") has stated: "Sports wagering via licensed operators and online fantasy competitions offered by registered operators are the only legal online gaming options in Maryland. No other forms of real-money online/mobile gaming or wagering are operating legally in Maryland."[2]

3.    Defendants do not offer a novel product that merely resembles gambling. They operate the same slot machines, blackjack tables, and roulette wheels found in licensed casinos—games for which the addictive potential is well-documented, which is precisely why Maryland subjects them to strict regulatory oversight.

4.    But Defendants go further: they wrap these gambling products in colorful, cartoonish packaging—animated characters, spinning treasure chests, and "leveling up" mechanics—drawn directly from the mobile games popular with children and adolescents. They then promote these platforms through celebrity endorsements, social media influencers, and advertising on platforms like TikTok and YouTube, whose audiences skew heavily toward minors. The result is an illegal

---

[1] Md. Code Ann., State Gov't § 9-1A-01, et seq.; Md. Const. art. XIX, § 1(e) (requiring voter approval for casino expansion).

[2] Maryland Lottery and Gaming Control Agency, *Legal vs. Illegal Online Gaming*, https://www.mdgaming.com/legal-vs-illegal-online-gaming/.

gambling operation dressed up as a children's game, marketed to young audiences, and operated from offshore jurisdictions without any of the consumer protections Maryland requires of legal gambling operations.

5.    In doing so, Defendants have extracted millions of dollars from Baltimore residents and the Baltimore economy.

6.    Defendants attempt to evade gambling regulations by disguising their offerings as "sweepstakes." On Defendants' websites, users purchase a virtual currency—typically called "gold coins"—and simultaneously receive a second currency called "sweeps coins" as a purported "bonus." Users can then bet the sweeps coins, which can be redeemed for real cash, prizes, or cryptocurrency. This is the very definition of gambling: consideration (payment), chance (random game outcomes), and prize (cash redemption).

7.    Defendants claim this dual-currency system transforms illegal gambling into a lawful "sweepstakes." But as the MLGCA's Managing Director of Gaming, Michael Eaton, wrote directly to Defendant VGW in November 2025: "These offerings contain the elements of gaming: consideration, chance, and prize. . . .In other words, it is gaming. . . . Under Maryland law, gaming is illegal unless it

3

is expressly authorized. . . . The gaming that is being offered through your site is not legally authorized in Maryland."[3]

8.      The human cost of Defendants' deception is severe. As *The Washington Post* recently reported, millions of Americans are betting real money on online casino games marketed as "sweepstakes"—and the games are leaving users thousands of dollars in debt.[4] One user described the experience: "It's almost like I blacked out. I remember how fast it went. It's such an embarrassing thing. These are such childlike little games. I don't even know how it happened."[5]

9.      The *New York Times* has documented how these platforms target minors, leaving "teenagers thousands of dollars in debt" before they are old enough to legally enter a regulated casino.[6] The platforms' ability to ensnare minors is a direct consequence of their unregulated status: they do not implement the verification protocols required of legitimate gambling operations.

10.      Furthermore, unlike regulated gambling operations, which contribute to state tax revenues and fund problem gambling treatment programs, social casinos

---

[3] Letter from Michael Eaton, Managing Director of Gaming, MLGCA, to Chumba Casino, cited in Casino.org, Maryland Lawmakers Refile Bills to Sweep Away Sweepstakes Casinos (Jan. 14, 2026), https://www.casino.org/news/maryland-lawmakers-refile-bills-ban-sweepstakes-casinos/.

[4] Rick Maese, *The 'Sweepstakes' Games That Look a Lot Like Online Gambling*, Wash. Post (Nov. 27, 2024) (citing Eilers & Krejcik Gaming research data) (describing a user who spent "thousands of dollars in payments for sweeps coins, often multiple deposits over the course of a single day[.]").

[5] *Id.*

[6] Neil Bedi et al., *How Crypto Casinos Lure in Young Gamblers*, N.Y. Times (Dec. 10, 2025).

4

contribute nothing. Yet the costs of the gambling addiction they create are externalized to Baltimore families and public services.

11. Pursuant to Baltimore City Code Art. 2, § 4, it is illegal for companies to use unfair, abusive, or deceptive trade practices. Defendants' advertisement and operation of illegal online gambling platforms under the pretextual guise of "sweepstakes"—while deceiving consumers about the nature of their products and extracting millions from vulnerable Baltimore residents—is unfair, deceptive, abusive, willful, against public policy, and prohibited by law.

## JURISDICTION

12. This Court has personal jurisdiction over Defendants. Defendants have purposefully availed themselves by operating their social casino platforms and advertising continuously in the State of Maryland and the City of Baltimore. They have willfully placed their gambling platforms into the stream of commerce with the knowledge and intent that their products would be widely disseminated in the State of Maryland and the City of Baltimore, and with further knowledge that the adverse effects of their illegal gambling operations would be felt in the State of Maryland and in the City of Baltimore.

13. By advertising their platforms in the State of Maryland and the City of Baltimore and accepting real-money transactions from Maryland residents, Defendants have availed themselves, through specific acts, of the privilege of

conducting activities within the State of Maryland and have conducted illegal acts within the State of Maryland and the City of Baltimore.

14. Defendants are, therefore, subject to the specific personal jurisdiction of the courts of this State. Md. Code Ann., Cts. & Jud. Proc. § 6-103 ("A court may exercise personal jurisdiction over a person, who directly or by an agent: (1) Transacts any business or performs any character of work or service in the State; (2) Contracts to supply goods, food, services, or manufactured products in the State; (3) Causes tortious injury in the State by an act or omission in the State[.]").

15. This Court's exercise of personal jurisdiction over Defendants is consistent with due process, as Defendants purposefully directed their gambling platforms into the State of Maryland and the City of Baltimore and otherwise availed themselves of the benefits and protections of the laws of the State of Maryland and the City of Baltimore.

16. This Court has subject matter jurisdiction because the claims at issue arise under a City of Baltimore ordinance. Md. Code Ann., Cts. & Jud. Proc. § 1-501 ("The circuit courts are the highest common-law and equity courts of record exercising original jurisdiction within the State. Each has full common-law and equity powers and jurisdiction in all civil . . . cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law[.]"); Baltimore City Code Art. 2, § 4-5(d) ("In addition to any other enforcement action

6

authorized by law, the City Solicitor, on behalf of the Mayor and City Council, may initiate a legal proceeding for injunctive relief and for the imposition and collection of civil penalties in a court of competent jurisdiction for a violation of this subtitle.").

## VENUE

17. Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. § 6-201, because a substantial part of the acts or omissions giving rise to the claims occurred in the City of Baltimore, Baltimore County. Md. Code Ann., Cts. & Jud. Proc. § 6-201 ("[A] civil action shall be brought in a county where the defendant . . . carries on a regular business[.]").

## THE PARTIES

### I. Plaintiff

18. Plaintiff is the Mayor and City Council of Baltimore, by Ebony Thompson, the City Solicitor of the Baltimore City Law Department, who has the statutory authority to enforce laws for the protection of the public. Baltimore City Charter art. 7, §§ 22–24.

### II. Defendants

**VGW**

19. Defendants VGW Malta Ltd., VGW GP Ltd., and VGW Games Ltd., Maltese corporations, are located at Trident Park, Notabile Gardens No6 – Level 3 Central Business District Mdina Road, Zone 2 BIRKIRKARA, CBD2010, Malta. Defendant VGW Canada Inc., a Canadian corporation, is located at 215 Spadina Ave

7

Toronto, Ontario, M5T 2C7, Canada. Defendant VGW Luckyland, Inc., a Delaware corporation, is located at 850 New Burton Road, Suite 201, Dover, Delaware, 19904. VGW operates Chumba Casino and Luckyland Slots[7] throughout the United States, including in Baltimore.

**McLuck**

20.     Defendant B-Two Operations Limited, a Manx corporation, is located at 18-20 North Quay, Douglas, Second Floor, Isle of Man, IM1 4LE. Defendant McLuck Inc. is a Delaware corporation located at 108 West 13th Street, Wilmington, Delaware, 19801. Collectively, B-Two Operations Limited and McLuck, Inc. operate the McLuck Casino platform throughout the United States, including in Baltimore.

**Pulsz**

21.     Defendant Yellow Social Interactive Limited, a Gibraltarian corporation, is located at World Trade Center, Bayside Road, Gibraltar GX11 1AA. Defendant YSI US, Inc., a Delaware corporation, is located at 850 New Burton Road, Suite 201, Dover, Delaware, 19904. Together, Yellow Social Interactive Limited and YSI US, Inc., operate Pulsz Casino throughout the United States, including in Baltimore.

**Stake.us**

---

[7] Maese, *supra* n.4.

8

22. Defendant Sweepsteaks Limited, a Cypriot corporation, is located at 7 Patrikiou Loumoumba, Block A, Office A13, 7560 Perivolia, Larnaka, Cyprus. Defendant Sweepsteaks Limited operates an office in the United States, located at 13101 Preston Road, Suite 110-5027, Dallas, TX 75240. Defendant Sweepsteaks Limited is controlled, run, and owned by several other entities, including Defendant Easygo Group Holdings Pty Ltd. ("Easygo"), an Australian Proprietary Company, located at Level 2, 287-293 Collins Street, Melbourne, Victoria, 3000, Australia. Sweepsteaks Limited and Easygo operate Stake.us throughout the United States, including in Baltimore.

**High 5**

23. Defendant PTT, LLC, a Delaware limited liability company, is located at 251 Little Falls Drive, Wilmington, Delaware, 19808. Defendant High 5 Entertainment, LLC, a Delaware limited liability company, is located at 254 Chapman Road, Suite 209, Newark, Delaware, 19702. PTT, LLC and High 5 Entertainment, LLC operate High 5 Games throughout the United States, including in Baltimore.

**Fortune Coins**

24. Defendant Blazesoft Limited, a Cypriot corporation, is located at 28 Oktovriou, 313 Omrania BLD, Limassol, CY-3105, Cyprus. Defendant Social Gaming, LLC is a Delaware corporation, located at 2711 Centerville Road, Suite

9

400, Wilmington, Delaware, 19808. Blazesoft Limited and Social Gaming, LLC operate Fortune Coins throughout the United States, including in Baltimore.

<strong>FACTUAL ALLEGATIONS</strong>

## I. Online Casino Gambling Is Illegal in Maryland

25. Maryland law prohibits most forms of gambling except those specifically authorized by the General Assembly and, in the case of expanded commercial gambling, approved by voters through constitutional referendum.[8] Under the Maryland Constitution, "[t]he General Assembly may only authorize additional forms or expansion of commercial gaming if approval is granted through a referendum, authorized by an act of the General Assembly, in a general election by a majority of the qualified voters in the State."[9]

26. Md. Code Ann., Crim. Law § 12-102 makes it illegal to bet, wager, or gamble or to "receive, become the depository of, record, register, or forward… money or any other thing or consideration of value, to be bet, wagered, or gambled on the result of a race, contest, or contingency."[10] A person or business who violates this section is guilty of a misdemeanor.

27. Maryland has authorized casino gambling only at six specific brick-and-mortar facilities: Hollywood Casino Perryville (Cecil County), Ocean Downs

---

[8] Md. Const. art. XIX, § 1(e).

[9] MLGCA, *FAQs*, https://www.mdgaming.com/welcome/faqs/.

[10] Md. Code Ann., Crim. Law § 12-102.

Casino (Worcester County), Live! Casino & Hotel (Anne Arundel County), Rocky Gap Casino Resort (Allegany County), Horseshoe Casino Baltimore (Baltimore City), and MGM National Harbor (Prince George's County).[11] These casinos were authorized through constitutional referenda in 2008 and 2012 and operate under strict regulatory oversight by the MLGCA.

28.    Online casino gambling—the operation of slot machines, blackjack, poker, roulette, and similar games via the internet—has never been authorized in Maryland. The MLGCA has explicitly confirmed this: "No other forms of real-money online/mobile gaming or wagering are operating legally in Maryland."[12] The agency maintains a "Legal vs. Illegal Online Gaming" page specifically warning consumers about unregulated operators.[13]

## II.    Defendants Operate Illegal Online Casinos

29.    Defendants do not merely offer games that imitate or simulate casino gambling. They offer the games themselves—slot machines, blackjack, poker, roulette, baccarat—through a "dual currency" system designed to cloak the nature of the activity. These are the same games, governed by the same random-number generators, employing the same mechanics, and producing the same addictive

---

[11] MLGCA, FAQs, *supra* n.9.

[12] MLGCA, *Legal vs. Illegal Online Gaming, supra* n.2.

[13] *Id.*

behavioral patterns that led Maryland to regulate casino gambling in the first place. The only meaningful distinction is that Defendants operate them illegally and without oversight.

30. Defendants offer gambling games through a "dual currency" system intended to cloak the fact they are offering straightforward gambling. For example:



*Stake.us "Gold Coins" and "Stake Cash"*



*Chumba Casino "Gold Coins" and "Sweeps Cash"*



*Luckyland "Gold Coins" and "Sweeps Coins"*

13



*Pulsz "Gold Coins" and "Sweepstakes Coins"*



*Fortune Coins "Gold Coins" and "Fortune Coins"*

14



*High5 "Gold Coins" and "Sweeps Coins"*

**Group Graphic A** – *Platforms' Dual Currency Systems*

31. The dual-currency system, with two types of "coins," as shown above, operates as follows:

    a. First, users purchase virtual currency, typically called "gold coins," which is ostensibly used only for "entertainment" gameplay. Users must pay real money—through credit cards, debit cards, or electronic payment services—to acquire this virtual currency.

    b. Second, operators simultaneously provide a second currency, called "sweeps coins" or "sweepstakes coins," alongside these purchases as a purported "bonus." Users earn these "sweeps coins" without leveraging any skill or strategy, meaning this "bonus" operates randomly.

    c. Third, and critically, the sweeps coins can be redeemed for prizes, real cash, or cryptocurrency, demonstrating that the entire transaction involves gambling for real economic value.

32. This structure contains all three elements that define gambling under Maryland and federal law: (1) consideration—users pay real money to purchase gold

15

coins and receive sweeps coins; (2) chance—game outcomes are determined by random number generators, not skill; and (3) prize—users can redeem sweeps coins. As the MLGCA stated: "These offerings contain the elements of gaming: consideration, chance, and prize. In other words, it is gaming."[14]

33.     The practical reality is that users must purchase gold coins—and thereby receive sweeps coins—to have any meaningful opportunity to play and win on these platforms. The "free" coins provided through receiving free games from alternative methods are insufficient for sustained play, forcing users who wish to continue gambling to purchase additional currency. This is consideration in exchange for the opportunity to gamble, which is the hallmark of gambling.

34.     Legitimate sweepstakes must provide participants with a free method of entry that offers a genuinely equal opportunity to win. While Defendants technically offer alternative methods to obtain sweeps coins—such as mailing handwritten requests or claiming small daily bonuses—these alternatives do not provide meaningful participation equivalent to purchased play.

35.     On Defendants' platforms, the volume of sweeps coins a user possesses directly determines their ability to place wagers, access higher-stakes games, and ultimately win redeemable prizes. A user relying solely on free methods receives a trickle of coins insufficient to engage with the platforms in any sustained or

---

[14] Letter from Michael Eaton, *supra* n.3.

competitive manner, while a user who purchases gold coin packages receives exponentially more sweeps coins and correspondingly greater opportunities to win.

36. This disparity renders the "free" alternative illusory: it is not a genuine path to participation but rather a token gesture designed to create the appearance of sweepstakes compliance. Because the opportunity to win on these platforms is functionally proportional to the amount of money spent, the free method of entry fails to provide equal opportunity—and Defendants' operations therefore fail to qualify as lawful sweepstakes.

37. Research confirms that players making purchases of coins at social casino games have significantly elevated rates of problem gambling behavior compared to non-purchasers.[15] This concentration of revenue among heavy users demonstrates that Defendants' business model depends on extracting money from users exhibiting patterns of disordered gambling—not providing harmless entertainment.

---

[15] Sally M. Gainsbury et al., *Virtual Addictions: An Examination of Problematic Social Casino Game Use Among At-risk Gamblers*, 64 Addictive Behaviors 334 (2017) ("Users are typically provided with a small amount of virtual currency to start play, with the option to purchase additional currency to enable further game play or an enhanced game experience (e.g., access to additional game features). . . There was a significant association between problematic gambling and problematic social casino gaming,").

## III.  The Scope of Defendants' Illegal Gambling Operation

38.  The social casino industry has grown into a multi-billion-dollar enterprise rivaling traditional gambling markets. By 2030, analysts predict the US market will grow to $14.42 billion.[16]

39.  In the United States, the social casino segment has experienced explosive growth. According to research firm Eilers & Krejċik Gaming, Americans wagered nearly $6 billion on social casino platforms in 2023, generating approximately $1.9 billion in net revenue for operators.[17] Analysts estimated that in 2024 U.S. players spent between $8.5 and $10.6 billion on gold coin packages.[18]

40.  Industry analysts have identified approximately 150 to 190 active sweepstakes casino brands operating in the United States as of late 2025.[19] This proliferation demonstrates both the lucrative nature of the illegal enterprise and the failure of existing enforcement mechanisms to contain it. Defendants are among the largest operators in the United States.[20]

---

[16] Research and Markets, Social Casino Market Report 2026 (January 2026), https://www.researchandmarkets.com/report/social-casino.

[17] Maese, *supra* n.4.

[18] RG.org, *How Social Casinos Generate Billions From Free-To-Play Models* (Sept. 19, 2025), https://rg.org/research/market/how-social-casinos-generate-billions-free-to-play-models.

[19] *Id.*

[20] Deadspin, *Best Sweepstakes Casinos: List of 200+ Top Sweeps Coins Casinos For February* (February 11, 2026), https://deadspin.com/sweepstakes-casinos/.

41. Based on population-adjusted estimates from industry data, Baltimore residents are likely losing millions of dollars to these unregulated operators—money that flows to offshore entities in Malta, Cyprus, and Estonia, jurisdictions purposefully chosen to avoid American oversight, enforcement, and taxation.

## IV. Academic Research Documents the Harms of Social Casino Gaming

42. A substantial body of peer-reviewed academic research has documented the harms associated with social casino gaming and its relationship to problem gambling. This research demonstrates that social casino games are not harmless entertainment, but rather gambling products that can create and exacerbate gambling disorders.

43. Research published in *Addictive Behaviors* by Gainsbury and colleagues found that social casino gamers who make purchases of gold coins— known as "microtransactions"—demonstrate significantly elevated rates of problem gambling compared to non-purchasers.[21] The study concluded that "virtual" gambling can produce the same addictive patterns as traditional gambling.

44. A landmark longitudinal study by Kim and colleagues, published in the *Journal of Gambling Studies*, tracked social casino gamers who had never previously gambled online. The study found that approximately one-quarter of participants

---

[21] Gainsbury et al., *supra* n.15.

(25%) migrated to traditional casino gambling within just six months of playing social casino games.[22] Making microtransactions—i.e., purchasing virtual currency—was the only unique statistical predictor of this migration from social casino gaming to online gambling.[23]

45.     The migration effect has been confirmed across multiple studies. Gainsbury and colleagues found that social casino players who spend money on in-game purchases were significantly more likely to subsequently migrate to traditional casino gambling.[24]

46.     Research on adolescent populations is particularly alarming. A study published in the *Journal of Behavioral Addictions* found that adolescent social casino gamers who spent money on the games exhibited gambling-related risks like increased impulsivity and reward sensitivity, comparable to at-risk adult gamblers.[25]

47.     A comprehensive study published in *BMC Public Health* examined over 10,000 students in grades 9–12 and found strong correlations between social

---

[22] Hyoun S. Kim et al., *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, 31 J. Gambling Stud. 1819, 1826 (2015).

[23] *Id.*

[24] Sally M. Gainsbury et al., *Migration from Social Casino Games to Gambling: Motivations and Characteristics of Gamers Who Gamble*, 63 Computers In Human Behavior 59, 62 (2016).

[25] Daniel L. King et al., *The Cost of Virtual Wins: An Examination of Gambling-related Risks in Youth Who Spend Money on Social Casino Games*, 5 J. Behavioral Addictions 401, 407-08 (2016).

casino gaming and problem gambling behavior.[26] The study noted that approximately 12% of students reported having played social casino games, demonstrating the widespread exposure of minors to these products.[27]

48.    Leading researchers on youth gambling published a review in the *International Journal of Law and Psychiatry* warning that social casino games warrant regulatory concern because they "normalize gambling" among youth and provide "access to gambling experiences without any of the consumer protections afforded by regulated gambling operators."[28] The authors noted that social casino games are "particularly attractive to youth" despite providers' claims that underage youth are not their target market.[29]

49.    Researchers have also documented that social casino games employ the same variable-ratio reinforcement schedules[30] that make slot machines and other gambling games addictive—random, intermittent rewards that activate the brain's

---

[26] L. Veselka et al., *Factors Associated with Social Casino Gaming Among Adolescents Across Game Types*, 18 BMC Public Health 1167, 1167 (2018).

[27] *Id.* at 1172 (citing T. Elton-Marshall et al. (2016)).

[28] Jeffrey L. Derevensky & Sally M. Gainsbury, *Social Casino Gaming and Adolescents: Should We be Concerned and is Regulation in Sight?*, 44 Int'l J. L. & Psychiatry 1, 4 (2016).

[29] *Id.*

[30] "A variable-ratio schedule means rewards come after a random number of responses, so it encourages continuous effort. Variable-ratio schedules create a steady, high rate of response because the reward is unpredictable." Verywell, *Variable-Ratio Schedule Characteristics and Examples* (August 20, 2025), https://www.verywellmind.com/what-is-a-variable-ratio-schedule-2796012.

21

dopamine system and create compulsive behavioral patterns.[31] Studies have found that these psychological mechanisms are deliberately employed in social casino game design to maximize user engagement and spending.[32]

50.     A report from the Council of Europe's International Co-operation Group on Drugs and Addictions specifically identified social casino games as posing significant risks for gambling-related harm, noting that the platforms' use of gambling mechanics combined with their lack of regulation creates conditions conducive to addiction.[33]

51.     The World Health Organization ("WHO") has recognized gambling disorder as a behavioral addiction, noting that it affects approximately 1.3% of the adult population globally and that rates of problem gambling are rising with the expansion of online gambling platforms.[34] The WHO has called for stronger regulatory frameworks to address the public health impacts of gambling.

## V.     Problem Gambling Causes Severe Harm, Including Elevated Suicide Risk

---

[31] Daniel L. King & Paul H. Delfabbro, *Predatory Monetization Schemes in Video Games (e.g. Loot Boxes) and Internet Gaming Disorder*, 113 Addiction 1967, 1967-68 (2018).

[32] *Id.*

[33] Council of Europe, *International Co-operation Group on Drugs and Addictions, Report on Online Gaming and Gambling Risks* (2024).

[34] World Health Org., *Gambling Fact Sheet* (Dec. 2024), https://www.who.int/news-room/fact-sheets/detail/gambling.

52.    Problem gambling is associated with devastating consequences, including financial ruin, relationship destruction, mental health disorders, and significantly elevated suicide risk. When social casino platforms create or exacerbate gambling disorders, the human costs are severe.

53.    Multiple studies have documented that individuals with gambling disorder have among the highest suicide rates of any addiction or mental health condition. A comprehensive cohort study using Norwegian health registry data found that patients with gambling disorder had a standardized mortality ratio for suicide of 5.12 compared to the general population—meaning they were more than five times as likely to die by suicide.[35] Suicide was the leading cause of death among patients with gambling disorder in that study, accounting for 25% of all deaths.[36]

54.    Research from the United States has found that those with gambling disorder have the highest suicide rate of any addiction disorder, with one in five gambling disorder patients having attempted suicide.[37] A study in the United Kingdom found that those with gambling disorder were six times more likely to have

---

[35] Marius Johansen et al., *Association Between Gambling Disorder and Suicide Mortality: A Comparative Cohort Study Using Norwegian Health Registry Data*, 47 Lancet Reg. Health Eur. 101084, 101084 (2024).

[36] *Id.*

[37] T.V. Mohan Rajan & A.B. Arunachalam, *Online Gambling and Suicide: Gambling with Lives*, 45 Indian J. Psychiatry 293 (2023).

suicidal thoughts and fifteen times more likely to have attempted suicide compared to the general population.[38]

55.     A Rutgers University Center for Gambling Studies survey found that 28% of problem gamblers reported suicidal ideation, 20% indicated they had made a suicide attempt, and 26% had participated in non-suicidal self-injury.[39]

56.     The FBI's Law Enforcement Bulletin has noted that gambling severity, depression, and alcohol dependence indicate strong risk factors for suicidal behavior among problem gamblers. Depression appears to be a key factor connecting suicidal behavior and problem gambling, often generated by the family, financial, and legal crises that gambling creates.[40]

57.     Problem gambling is also associated with elevated rates of depression, anxiety, substance abuse, bankruptcy, divorce, and family disruption.[41] Studies have found that problem gamblers are three times more likely to suffer from major

---

[38] *Id.*

[39] Kindbridge Behavioral Health, *Gambling Suicide Statistics | New Research Indicates Crisis* (Mar. 12, 2024) (citing Rutgers University Center for Gambling Studies).

[40] *Id.*

[41] V. Marionneau & J. Nikkinen, *Gambling-related Suicides and Suicidality: A Systematic Review of Qualitative Evidence*, 13 Frontiers IN Psychiatry 980303, 980304 (2022).

depressive episodes than non-problem gamblers.[42] Approximately 30–50% of pathological gamblers have co-occurring substance use disorders.[43]

58. Unlike substance use disorders, gambling addiction is often described as a "silent addiction" because there are few outwardly observable signs.[44] As researchers have noted, "an individual can gamble away the family savings on their mobile phones in secret," making detection difficult until severe harm has already occurred.[45] Social casino platforms—accessible 24 hours a day on mobile devices—are ideally suited to enable this hidden pattern of addiction.

## VI. Social Casinos Operate Without the Protections Required of Legal Gambling

59. Maryland has established comprehensive consumer protection requirements for its licensed brick-and-mortar casinos, including age verification, self-exclusion programs, responsible gambling interventions, and game fairness requirements precisely to mitigate the gambling-related risks discussed above. Social casinos operate without *any* of these safeguards—not because they are exempt from gambling regulations, but because they operate illegally outside the regulatory framework.

---

[42] Georgia DBHDD, *Depression, Suicide and Problem Gambling* (citing N.M. Petry et al., 66 J. Clinical Psychiatry 564 (2005)).

[43] Nancy M. Petry et al., *Suicidal Ideation and Suicide Attempts in Treatment-Seeking Pathological Gamblers*, 66 J. Clinical Psychiatry 1617, 1618 (2005).

[44] Kindbridge Behavioral Health, *supra* n.39.

[45] *Id.*

60. Maryland's licensed casinos must implement robust age verification systems to prevent minors from gambling. Under state regulations, casinos must verify that patrons are at least 21 years old before allowing them to gamble.[46] Defendants, by contrast, require only that users enter a birthdate and check a box attesting to their age—a trivial system easily circumvented by minors. As *The New York Times* has documented, this allows teenagers to gamble and accumulate thousands of dollars in debt.[47]

61. Maryland law requires gambling operators to participate in the statewide Voluntary Exclusion Program, allowing individuals with gambling problems to voluntarily ban themselves from gambling at licensed facilities.[48] This is a critical harm-reduction tool for those struggling with gambling addiction. Defendants do not participate in Maryland's self-exclusion program. A Baltimore resident who has taken the step of self-excluding from regulated gambling to address an addiction can still freely access Defendants platforms and continue gambling—often with even fewer barriers than regulated alternatives.

62. Maryland regulations require licensed gambling operators to implement responsible gambling measures, including intervention protocols when

---

[46] Md. Code Ann., State Gov't § 9-1A-27.

[47] Bedi et al., *supra* n.6.

[48] Md. Code Regs. 36.03.09.

26

customers display signs of problem gambling.[49] Licensed operators must train employees to identify warning signs of gambling disorder and must offer resources to affected customers. Defendants implement no such interventions. To the contrary, their business model depends on maximizing play from their heaviest users—the very users most likely to be suffering from gambling disorder.

63. Maryland law requires that licensed slot machines must pay out a minimum of 85% to players, with regulations requiring casinos to maintain a floor-wide payout percentage between 85% and 95%.[50] These payout percentages are publicly posted and verified by regulators. Social casinos, including those operated by Defendants, abide by no such requirements. Users have no way of knowing whether the games are programmed fairly, whether disclosed odds are accurate, or whether game algorithms are designed to maximize losses. Studies have found that social casino games often feature "inflated payout rates" that differ from real gambling—potentially to create unrealistic expectations before users transition to traditional casinos.[51]

---

[49] Md. Code Regs. 36.03.10.

[50] MLGCA, FAQs, *supra* n.9.

[51] Hyoun S. Kim et al., *Why do Young adults Gamble Online? A Qualitative Study of Motivations to Transition from Social Casino Games to Online Gambling*, 7 Asian J. Gambling Issues Pub. Health 6, 6 (2017).

64.     The absence of regulatory oversight has tangible consequences. While licensed operators face regulatory scrutiny and potential license revocation for exploiting problem gamblers, social casinos face no such accountability. The American Gaming Association, the national trade group representing the regulated casino industry, has called on gaming regulators and state attorneys general to investigate social casino operators, noting that "the lack of regulatory oversight presents many risks for consumers as well as the integrity of the gaming market, including weak (if any) responsible gaming protocols, lack of age verification . . ."[52]

## VII.   Defendants Market Illegal Gambling as Harmless Entertainment

65.     Defendants deliberately and heavily advertise and market their platforms using language designed to obscure the gambling nature of their operations and evade consumer skepticism. This deceptive marketing is central to their scheme to evade gambling laws.

66.     Defendants market their platforms as "free games," "social entertainment," and "sweepstakes" rather than what they actually are: illegal gambling operations that can and do result in significant financial losses. This terminology is deliberately chosen to appeal to individuals who might otherwise

---

[52] Herzog Law, *Breaking Down the Latest Sweepstake and Social Casino Lawsuits and Enforcement in the United States and Australia* (Aug. 26, 2024), https://herzoglaw.co.il/en/news-and-insights/breaking-down-the-latest-sweepstake-and-social-casino-lawsuits-and-enforcement-in-the-united-states-and-australia/ (citing AGA statement).

avoid gambling, including individuals with gambling addiction concerns who believe they are choosing safe entertainment alternatives.

67. Defendants' platforms display prominent notices claiming they offer "no purchase necessary" gameplay.



**Graphic B** – *VGW's Chumba "Free Coins" Advertisements*



**Graphic C** – *VGW's Luckyland Slot's "Free Coins" Welcome Offer*

29



**Graphic D** – *Stake.us "Free" Bonus Offer*



**Graphic E** – *Pulsz Casino "Free" Bonus Offer*



**Graphic F** – *High 5 "Free" Gold Coin Advertisements*



**Graphic G** – *Fortune Coins "Free" Fortune Coins Offers*

68.   Yet the practical reality—as documented by industry analysts and user experiences—is that users must purchase virtual currency to participate meaningfully. The "free" coins provided are designed to be insufficient for sustained play, drawing users into purchasing additional currency. This bait-and-switch tactic deceives consumers into believing they can enjoy the platforms without financial risk.

69.   Defendants employ "gamification" techniques designed to obscure the true cost of play. By converting real money into virtual currency—gold coins—

31

Defendants dissociate users from the actual money they are spending. Research has shown that this psychological distancing effect leads consumers to spend more than they would if transacting directly in cash.[53] The use of virtual currency is not just to cloak the fact that Defendants are operating gambling operations; it is central to their ability to extract greater spending from users.

70. Defendants advertise extensively on social media, television, streaming platforms, and through online advertising networks. Their advertisements feature casino imagery—slot machines, chips, coins, cards, roulette wheels—while simultaneously claiming that users are merely playing "free games." This juxtaposition is inherently deceptive: it attracts consumers with the thrill of casino gambling while claiming the activity is something other than gambling.

## VIII. Defendants Target Youth

71. Defendants' platforms are designed, marketed, and operated in ways that foreseeably attract and engage minors—despite token disclaimers that their services are intended for users aged 18 or older. Defendants target youth through multiple, reinforcing vectors: gamified design elements drawn from mobile gaming popular with children and adolescents; advertising on platforms and through influencers with disproportionately young audiences; colorful, cartoonish visual

---

[53] Daniel L. King & Paul H. Delfabbro, *Predatory Monetization Schemes in Video Games (e.g. Loot Boxes) and Internet Gaming Disorder*, 113 Addiction 1967, 1967-68 (2018).

branding that mimics children's games; and age-verification systems so perfunctory that they function as no barrier at all.

72. Defendants do not employ meaningful age-verification measures. Instead, they rely on simple self-certification—requiring users only to enter a birthdate or check a box confirming they are 18 or older. This system is trivially defeated: a minor need only enter a false date of birth to gain unrestricted access to Defendants' gambling platforms.[54] By contrast, Maryland's licensed casinos require physical, in-person identification checks, and regulated online sports wagering platforms in Maryland require users to submit government-issued identification and undergo identity verification through third-party systems before placing any wager. Defendants' failure to implement comparable technology is a deliberate choice that allows them to capture a younger user base while maintaining plausible deniability about the presence of minors on their platforms.

---

[54] High 5 requests verification to "cash out" or receive prizes. Upon information and belief, Stake.us only recently implemented industry-standard age verification before users can access game play. Verification at redemption—rather than at account creation or first play—means that a minor can create an account, access the full suite of gambling games, and develop addictive gambling patterns long before encountering any identity check. By the time a platform requests identification, the harm has already occurred: the minor has been exposed to variable-ratio reinforcement schedules, has potentially spent money purchasing virtual currency (using a parent's or other adult's payment method), and may have developed disordered gambling behaviors. Moreover, verification at redemption does nothing to prevent the most common pathway to harm—a minor who spends money on gold coin purchases but never attempts to redeem winnings, or who abandons the platform after losing money, will never trigger any verification at all. A meaningful age-verification system must operate at the point of access, not at the point of cashout, to serve its protective function. Every day that Stake.us operated without third-party age verification is a day where minors were exposed to the same harms detailed above.

33

73.     Defendants' platforms incorporate design features characteristic of mobile games popular among minors, including bright, cartoonish graphics; animated characters and mascots; spinning wheels and treasure chests; "leveling up" progression systems; daily login rewards; and achievement badges.

74.     These mechanics are drawn directly from the mobile gaming ecosystem of which minors form a significant user base. The platforms' visual aesthetics— featuring cartoon animals, neon colors, fantasy themes, and playful sound effects— are virtually indistinguishable from games marketed to children on major app stores. This is not coincidental: these design choices maximize engagement among younger users who have been conditioned by a lifetime of mobile gaming to respond to precisely these stimuli.

75.     Defendants advertise heavily on social media platforms with disproportionately young user bases, including TikTok, Instagram, YouTube, and Snapchat. Defendants' advertisements appear alongside—and are stylistically indistinguishable from—content aimed at adolescents and young adults. Defendants further amplify their reach among young audiences by sponsoring and partnering with social media influencers and content creators whose followings skew heavily toward minors and young adults. These influencers promote Defendants' platforms through livestreams, sponsored posts, and promotional codes—formats that blur the

34

line between entertainment and advertising in ways that are particularly effective at reaching minors who may not recognize promotional content as such.

76.    For example, VGW (Luckyland and Chumba)'s advertising strategy illustrates the deceptive marketing at play. The company employs celebrities including WWE wrestlers, Ryan Seacrest, Michael Phelps, and DJ Khaled as pitchmen.[55] The company's advertisements also include videogame-like design, which appeals to youth.



**Graphic H** – *Chumba Casino WWE Sponsorship*

---

[55] Maese, *supra* n.4.



**Graphic I** *–Chumba Casino Ryan Seacrest Advertisement*



**Graphic J** *– LuckyLand Slots Videogame-like Advertisement*

36

77.    Similarly, Stake.us partnered with Adin Ross and Drake to "livestream" gambling on the platform and heavily market its product to youth.[56] "Children 11 to 13 are the most likely (54%) age group to be watching [live streaming] broadcasts."[57]



**Graphic K** – *Stake.us Livestream with Streamer Adin Ross and Musician Drake*

---

[56] Stake.us, *Drake*, https://stake.com/drake.

[57] Internet Matters, *Live streaming report reveals nearly a third of 11 to 13 year old are broadcasting themselves live over the internet* (June 5, 2018), https://www.internetmatters.org/hub/research/rise-of-the-streamager-nearly-a-third-of-11-to-13-year-old-are-broadcasting-themselves-live-over-the-internet/.



**Graphic L** – *"Champagnepapi" (Drake) Instagram Post Captioned "Gambling These Days" and Stake.us Bet*

78.    Pulsz Casino and Fortune Coins also employ videogame-like design on their websites and advertisements to entice young people to play and spend money on coins.



**Graphic M** – *Pulsz Casino Videogame-like Design*



**Graphic N** – *High 5 Videogame-like Design*



**Graphic O** – *Fortune Coins Videogame-like Design*

79. The videogame-like design, celebrity endorsements, and influencer partnerships are strategically selected to reach younger demographics: videogames, professional wrestling, hip-hop artists, and livestream culture each command audiences that skew heavily toward adolescents and young adults. The partnerships are not incidental to Defendants' marketing strategy—they are central to it, leveraging figures and cultural touchpoints that resonate most powerfully with youth. Moreover, these celebrity endorsements lend an air of legitimacy to platforms that Maryland regulators have explicitly determined are operating illegally.

80. The convergence of youth-oriented design, advertising targeted at young audiences, and negligible age verification has predictable results. As *The New York Times* has reported, minors are gambling on social casino platforms and accumulating thousands of dollars in debt—debts incurred before they are old

40

enough to legally enter a regulated casino.[58] Because Defendants operate outside Maryland's regulatory framework, there are no responsible-gambling interventions to identify or protect these underage users.

81.     Once a minor gains access, Defendants' platforms offer no friction: no spending limits calibrated to age, no cooldown periods, no parental controls, and no mechanisms to detect patterns of use consistent with a minor user. The design of these platforms uses the same impulse control mechanism—variable-ratio reinforcement schedules—which operate on minors' developing brains with particular potency, as adolescents are neurologically more susceptible to impulsive decision-making and reward-seeking than adults.

## IX.   Baltimore-Specific Allegations

82.     Defendants' illegal social casino platforms have caused concrete and ongoing harm to residents of the City of Baltimore. Baltimore residents have accessed Defendants' platforms from within the City and spent money through Defendants' dual-currency systems.

83.     Recognizing as much, Seth Elkin, a spokesman for the MLGCA, warned Maryland residents, including Baltimoreans, "We have a list of all of Maryland's authorized [    ] betting operators available at mdgaming.com. But there

---

[58] Bedi et al., *supra* n.6.

41

are lot [sic] of illegal sites that pose risks to consumers. So we want people to know the difference and know how to find the legal option."[59]

84.   Because Defendants operate without responsible gambling protocols, or participation in Maryland's Voluntary Exclusion Program, Baltimore residents who would be protected from harm in regulated gambling environments are exposed to unrestricted, continuous gambling through mobile devices.[60]

85.   The economic impact of Defendants' conduct is felt directly within Baltimore City. Based on industry estimates of per-capita social casino spending and Baltimore's population, Baltimore residents are likely losing millions of dollars each year to Defendants' unregulated platforms.

86.   These losses are not offset by any public benefit. Unlike Maryland's licensed casinos, Defendants pay no state or local gaming taxes, contribute nothing to problem gambling treatment programs, and provide no funding for addiction services.

87.   The resulting financial harm manifests locally through increased consumer debt, depleted household resources, and heightened demand for municipal

---

[59] WFMD, *Maryland Lottery & Gaming Urgers Residents To Only Use Legal Sports Gambling Sites* (Aug. 28, 2025), https://www.wfmd.com/2025/08/29/maryland-lottery-gaming-urges-residents-to-only-use-legal-sports-gambling-sites/.

[60] *Id.*

services addressing housing instability, financial counseling, and behavioral health crises.

## X.  Defendants' Actions Violate Maryland Public Policy

88.  Maryland has established a comprehensive regulatory framework for gambling designed to protect consumers from the harms that unregulated gambling causes. Defendants' operations directly contravene this public policy.

89.  Maryland law reflects a clear public policy that gambling is illegal unless specifically authorized. The Maryland Constitution requires that any expansion of commercial gambling must be approved by a majority of voters in a statewide referendum.[61] This constitutional requirement reflects Maryland's deliberate approach to gambling expansion—one that balances economic considerations against consumer protection concerns through democratic processes.

90.  Online casino gambling has never been authorized by Maryland voters or the General Assembly. Defendants' operation of online casino platforms—regardless of what they call them—violates the clear public policy that such gambling remain prohibited absent specific legislative authorization and voter approval.

91.  Maryland's regulatory framework for licensed gambling operations reflects a public policy that gambling, where permitted, must be accompanied by

---

[61] Md. Const. art. XIX, § 1(e); MLGCA, FAQs, *supra* n.9.

43

robust consumer protections. Licensed casinos must implement age verification, participate in self-exclusion programs, adopt responsible gambling measures, and submit to regulatory oversight. By operating gambling platforms without any of these protections, Defendants violate the public policy that gambling—where permitted—must be conducted responsibly. Defendants deliberately flouted Maryland's prohibitive gambling laws each day they operated within the period.

## CLAIM FOR RELIEF

### *Unfair, Abusive, and Deceptive Trade Practices*
### Baltimore City Code Art. 2, §§ 4-1, *et seq.*

92.    The City of Baltimore reasserts, realleges, and incorporates by reference each of Paragraphs 1–91, above, as though fully set forth below.

93.    The CPO, Baltimore City Code Art. 2, § 4-2, protects consumers and others against "unfair, abusive, or deceptive trade practices," which are defined in line with the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law, § 13-301. *See* Baltimore City Code Art. 2, § 4-1(13). These "[u]nfair, abusive, or deceptive trade practices include[,]" among others, any:

> a. False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers, Md. Code Ann., Com. Law, § 13-301(1);

> b. Failure to state a material fact if the failure deceives or tends to deceive, Md. Code Ann., Com. Law, § 13-301(3);

44

c. Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: [t]he promotion or sale of any consumer goods, consumer realty, or consumer service, Md. Code Ann., Com. Law, § 13-301(9)(i).

94. Any "practice prohibited by this title is a violation of this title, whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." *Id.* § 13-302. While specific practices are enumerated in the MCPA (and, by extension, the CPO), "[i]t is the intent of the [Maryland] General Assembly that in construing the term 'unfair or deceptive trade practices,' due consideration and weight be given to the interpretations of § 5(a)(1) of the Federal Trade Commission Act [(15 U.S.C. § 45)] by the Federal Trade Commission and the federal courts." Md. Code Ann., Com. Law § 13-105.

95. The Federal Trade Commission has explained that unfairness under 15 U.S.C. § 45 is determined in part by a consideration of "(1) whether the practice injures consumers," and "(2) whether it violates established public policy."[62]

96. Defendants are "merchants" within the meaning of, and subject to, the provisions of the CPO. Baltimore City Code Art. 2, § 4-1(9).

97. Defendants' actions are deceptive and unfair. Without limitation, Defendants violate the CPO by:

---

[62] FTC Policy Statement on Unfairness (Dec. 17, 1980), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness.

45

a. Operating illegal online gambling platforms in Maryland in violation of Md. Code Ann., Crim. Law § 12-102 and marketing those platforms to Baltimore consumers;

b. Deceptively representing via their websites, advertising, and marketing materials that their platforms constitute lawful "sweepstakes" or "social entertainment" when they are, in substance, illegal gambling operations;

c. Deceptively representing via their websites, advertising, and marketing materials that their platforms offer "free games" and "no purchase necessary" play when, in practical reality, users must purchase virtual currency to participate meaningfully;

d. Designing, marketing, and operating their platforms and advertisements in ways that foreseeably attract and engage minors, including by employing cartoonish graphics, animated characters, and gamified design elements; and advertising on social media platforms with disproportionately young user bases and partnering with influencers and celebrities whose followings skew heavily toward minors and young adults;

e. Using a "dual currency" system specifically designed to obscure that users are gambling for real economic value and to evade Maryland's gambling laws;

f. Failing to disclose, in their advertising and on their websites, that their platforms constitute illegal gambling under Maryland law, with all the attendant risks of financial loss and addiction;

g. Failing to implement age verification systems adequate to prevent minors from gambling on their platforms;

h. Failing to exclude problem gamblers, thereby enabling individuals attempting to address gambling addiction to continue gambling;

i. Failing to implement any responsible gambling interventions or protocols to identify and assist users displaying signs of problem gambling;

46

j. Failing to disclose material information about game odds or whether games are programmed to operate fairly;

k. Using virtual currency systems to psychologically distance consumers from the real money they are spending, thereby inducing greater spending than consumers would otherwise undertake.

98. Defendants committed distinct violations of the CPO each day that they made deceptive representations in Baltimore and each time one of their deceptive misrepresentations was served into or viewed within Baltimore.

99. Defendants committed distinct violations of the CPO each day that their websites were available within Baltimore, each time their websites were joined by a Baltimorean, each time a Baltimorean paid money to Defendants, and each time a Baltimorean gambled on their websites.

100. Defendants' practices caused and cause substantial injury to Baltimore consumers that is not reasonably avoidable by consumers themselves.

101. With the nature of Defendants' advertisements and marketing materials, consumers could not reasonably determine that Defendants' "sweepstakes" platforms are illegal gambling operations, could not verify whether game odds are fair, and could not protect themselves from the addictive design features Defendants employ.

102. Defendants' actions are against public policy. It is the public policy of the State of Maryland, as expressed through its Constitution, criminal statutes, and comprehensive civil gambling regulatory framework, that online casino gambling is

47

prohibited and that gambling operations must be licensed, regulated, and subject to consumer protections. Defendants' operation of illegal online gambling platforms without any of these safeguards directly violates this public policy.

103. Defendants' actions demonstrate a callous disregard not only for the rule of law, but also for the public health, safety, and well-being of Baltimore consumers. While engaging in the unlawful practices alleged herein, Defendants have always acted willfully. Defendants knew or should have known that their actions were prohibited by Maryland law.

104. As a result of the foregoing, the City seeks all legal and equitable relief as allowed by law, including civil penalties, injunctive relief, restitution, and disgorgement.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, the City of Baltimore, respectfully requests that the Court enter judgment in its favor and against Defendants, as follows:

a. Awarding the maximum amount of statutory penalties available under Baltimore City Code Art. 2, § 4-3(a), for each violation of Baltimore's CPO, Baltimore City Code Art. 2, § 4-2;

b. Injunctive relief mandating that Defendants cease operating their illegal gambling platforms in the City of Baltimore and prohibiting them from accepting transactions from Baltimore residents;

c. Disgorgement of ill-gotten gains derived from Defendants' unlawful practices;

d.   Restitution to Baltimore consumers harmed by Defendants' unlawful practices; and,

e.   Awarding such other relief as may be available and appropriate under the law or in equity.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims upon which a jury trial is available.

Dated: April 8, 2026

Respectfully submitted,

Ebony M. Thompson
City Solicitor

_____/s/_____
Sara Gross (AIS No. 0412140305)
Chief, Affirmative Litigation Division
Natalie Neill (AIS No. 2012180092)
Assistant Solicitor
BALTIMORE CITY
LAW DEPARTMENT
City Hall, Room 101
100 North Holliday Street
Baltimore, Maryland 21202
Tel: (410) 396-3947
ebony.thompson@baltimorecity.gov
sara.gross@baltimorecity.gov

Adam J. Levitt*
Daniel R. Ferri*
Eaghan Davis*
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com

edavis@dicellolevitt.com
*pro hac vice motions to be filed
Counsel for Plaintiff, the City of Baltimore